## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## GENERAL TELEPHONE DIRECTORY COMPANY, Respondent.

### No. 78–1218.

United States Court of Appeals, Ninth Circuit.

Aug. 22, 1979.

Lawrence Blatnik (argued), Elliott Moore (on brief), N. L. R. B., Washington, D. C., for petitioner.

Renato J. Della Rocca, Marina Del Rey, Cal., on brief, for respondent.

Before TRASK and WALLACE, Circuit Judges, and HOFFMAN,* District Judge.

WALTER E. HOFFMAN, District Judge:

Petitioner seeks enforcement of an order of the National Labor Relations Board against respondent General Telephone Directory Company (hereafter the company or employer), a subsidiary of General Telephone and Electric Company engaged in the compilation and sale of telephone numbers and street address directories.[1]

Prior to the commencement of a union organizational campaign by the International Brotherhood of Electrical Workers, AFL–CIO, Local Union No. 2139 (hereafter the union), the National Labor Relations Board found, in accordance with most of the factual findings of the administrative law judge (ALJ), that respondent company, through a number of its supervisors, advised the sales representatives of budgeted wage increases scheduled for January 1976.

On August 4, 1975, the union filed a petition for a certification election in a unit composed of specific employees of the company.[2] From this date until the election, held November 7, 1975 on a secret ballot,[3] further statements of an alleged violative nature, indicating the company's position with regard to the scheduled wage increases relative to the advent of unionization, were made by various general managers and district sales managers to their employees. The Board's order deals with occurrences during this period which it found to be violative of the National Labor Relations Act (Unfair Labor Practices; Unfair Labor Practice Affecting Commerce), 29 U.S.C. § 158(a)(1):[4]

1. General Telephone Directory threatened to withhold a promised wage increase in the advent of union organization;

2. General Telephone Directory threatened loss of pay increases through a district sales manager, such threats being of a coercive nature.[5]

The order requires the company to cease and desist from the unfair labor practices found and to conduct a second election among the employees in the appropriate unit, thereby setting aside the election of November 7, 1975.

We conclude, for the reasons set forth below, that the application of the Board for the enforcement of its order should be denied, and the election of November 7, 1975 should stand.

I

■ It is a well established rule that the predictions or opinions of an employer, reasonably based on fact, relative to the possible effects of unionization within its company, are not violative of the National Labor Relations Act. This Court, following the Supreme Court in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), enumerated the rule most distinctly in *NLRB v. Lenkurt Electric Co.,* 438 F.2d 1102, 1105 (1971):

It is well established law that an employer has the right to express an opinion or

---

* Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

1. General Telephone Directory Company, 233 N.L.R.B. No. 72.

2. The company's western region is divided into eight sales divisions, each headed by a district sales manager, who usually supervises the activities of about four sales representatives. Above the district sales manager is a division manager. The election unit was composed of employees involved in premise sales, street address directory sales and telephone sales employees.

3. Out of 111 eligible voters, 53 cast their ballots in favor of the union, 56 opposed, and one vote was challenged. One eligible did not vote.

4. As affecting commerce, 29 U.S.C. § 152(6), (7).

5. This affirmed the rulings, findings, and conclusions of the administrative law judge (ALJ). The NLRB did, however, modify the ALJ's findings to include testimony which the ALJ had not deemed violative of the Act, § 8(a)(1). The Board further found a lack of evidence of subsequent disciplinary action by the company against employees (allegedly threatened), in opposition to the findings of the ALJ on this issue.

predictions of unfavorable consequences which he believes may result from unionization. Such predictions or opinions are not violations of the National Labor Relations Act if they have some reasonable basis in fact and provided that they are in fact predictions or opinions other than veiled threats on the part of the employer to visit retaliatory consequences upon the employees in the event that the union prevails.

The Court in *Gissel* made it clear that the employer's First Amendment right of free speech falls within § 8(c) of the Act, and is as important, if not more so, than that of the union seeking to represent the employee. The careful balancing of interests and motives supply the rationale for concluding whether there has been, in fact, a violation under the Act. *Gissel* allowed statements by the employer as to unionism or a particular union in any form "so long as the communications do not contain a 'threat of reprisal or force or promise of benefit,'" 395 U.S. at 618, 619, 89 S.Ct. at 1942.

▪ The recent case before us of *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1129 (9th Cir. 1978), has refined further the balancing technique and guides in determining the highly subjective character of an employer's statements:

> [A] presumption of illegal motives adheres to wage increases granted prior to an election . . . ., [but] the cases make it crystal clear that the vice involved in both the unlawful increase situation and the unlawful refusal to increase situation is that the employer has *changed* the existing conditions of employment. It is this *change* which is prohibited and which forms the basis of the unfair labor practice charge. (emphasis in original)

It is not the intent of the Act[6] that the statements of an employer constituting unfair labor practice be considered in a vacuum, *NLRB v. Lenkurt Electric Co., supra,* at 1107:

In determining whether an employer's communications constitute permissible argument or prohibited threats, the statements must be considered in the context of the factual background in which they were made, and in view of the totality of employer conduct.

Thus, prior to a determination of the violative nature of an employer's epithet, we must look not only to the motive of such statements, but also to the context in which they were made, and whether they have been made with a reasonable basis in fact.

*Lenkurt* defines context in terms of the company's prior policies toward, and background of, union or antiunion sentiment before the proposed union election. In *Lenkurt,* the absence of antiunion sentiment led this court to conclude that, in the context of a previously neutral stance by a company toward a union, vigorous campaigning in the form of "predictions of possible disadvantages which might arise from economic necessity or because of union demands or union policies," were not communications of a prohibited nature. *Lenkurt Electric Co., supra,* at 1107. *Don The Beachcomber v. NLRB,* 390 F.2d 344 (9th Cir. 1968); *NLRB v. Sonora Sundry Sales, Inc.,* 399 F.2d 930 (9th Cir. 1968); *NLRB v. TRW-Semiconductors, Inc.,* 385 F.2d 753 (9th Cir. 1967); *NLRB v. Laars Engineers, Inc.,* 332 F.2d 664 (9th Cir. 1964).

As stated in *Free-Flow Packaging,* 566 F.2d at 1129:

> The employer's dilemma, then, persists, save when the status quo—the state of existing conditions of employment with respect to wage increases—is clearly apparent and it can with assurance be said that grant or denial of a wage increase would constitute a change from those conditions. In a case where status quo is not clearly apparent, and accordingly the employer's dilemma persists, no inference of antiunion motive can be said to flow from an after-the-fact determination of what the status quo in fact was.

---

**6.** *Labor Board v. Virginia Power Co.,* 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941); *P. R. Mallory & Co. v. NLRB,* 389 F.2d 704 (7th Cir. 1967); both cited with approval in *NLRB v. Lenkurt Electric Co., supra.*

Status quo is, therefore, in the context of the management-union dichotomy, a question of economics, particularly when the alleged unfair labor practice consists of statements involving wages, benefits, protections, etc., which are the essence of union involvement in the labor force of this country.

It is within these guidelines of employer motive, "reasonable basis in fact," context and status quo that we must turn to the facts before us, as determined by the ALJ and the Board, and to glean what inferences may be so established as to support or reverse the latter's conclusions.[7]

## II

■ According to findings of the ALJ, the western regional general manager of General Telephone, Richard Fick, informed a group of the company's clerical employees at a meeting in Ventura that they would receive a wage increase in January of 1976. The ALJ, in comparing Fick's testimony with that of other company supervisors who had participated in alleged threatening or coercive communications to employees, concluded that the statements made by Fick at that time were a hedge, and indicia of the company's intent to renege on its commit-

ment to grant pay increases. Petitioner argued, and the ALJ accepted, that specific phrases communicated by Fick were retaliatory, retributory, and threatening; although the ALJ found many of Fick's statements "close to the line," it was his conclusion, and that of the Board, that general manager Fick had violated § 8(a)(1) of the Act.[8]

The Board relies on such phrases as: "wage increases would become a negotiable term;" the company would start with a "blank piece of paper;" and unionization would initiate "horse-trading," in support of its inferences of threats of retaliatory action by the company in the advent of a union victory in the election. Taken out of context, inferences would indeed be drawn that Fick intended to relay an omen of economic consequence should the employees vote for union representation. We disagree with the inference drawn therefrom by the ALJ and the Board. As this court views Fick's statements, and those discussed, *infra,* we find the communications not only innocuous in light of the circumstances, but well within the employer's "protected speech" under § 8(c) of the Act.

■ Predictions of economic consequences by an employer as we found them

---

7. The policy of the Board, and of this court, has been to accept the factual findings and/or resolution of credibility made by the ALJ. However, *NLRB v. Lenkurt Electric Co.,* at 1105, n. 3, states: "where a disagreement between the Board and the trial examiner does not turn upon questions of fact or upon the credibility of witnesses, but upon inferences to be drawn from the record as a whole, no special weight need be given to the conclusions of the trial examiner. *Hawkins v. NLRB,* 358 F.2d 281 (7th Cir. 1966); *Cheney California Lumber Co. v. NLRB,* 319 F.2d 375, 377 (9th Cir. 1963). The Board is free to accept the basic facts and credibility determinations and to draw inferences therefrom different from that drawn by the trial examiner. In such cases, however, the reviewing court will carefully examine the Board's findings, and overbearing evidence calling for inferences contrary to those of the Board must be controlling. *Jervis Corp., Bolivar Division v. NLRB,* 387 F.2d 107 (6th Cir. 1967); *NLRB v. Mt. Vernon Telephone Corp.,* 352 F.2d 977 (6th Cir. 1965)." In *NLRB v. Mt. Vernon Telephone Corp., supra,* the court states, citing *NLRB v. Elias Brothers Big Boy, Inc.,* 327 F.2d 421, 426 (6th Cir. 1964): "In a

proper case this Court may decline to follow the action of an examiner in crediting and discrediting testimony, even though the Board has adopted the examiner's findings."

8. The transcript (RT 239) reveals that Fick's statements were as follows:

I explained that the $2000 raise had been *budgeted* in the spring of the year, and that if the *economic* conditions were the same in January, '76 that they were when we *budgeted* the increase, that they would be given. That as far as we knew they were still planned.

That if we were in the process of negotiating with the union, as all wages, benefits and working conditions, they would become a negotiable item.

That in the course of negotiations, it's like starting with a blank piece of paper: each side tried to get certain benefits and things that they want into the contract—and one side might give up one benefit to get something else that they wanted. It's kind of like horse-trading.

in *Lenkurt Electric Co.* fell within the purview of the "context" or "status quo" guidelines and were not violative of the Act. The statement that a wage increase had been "budgeted", as is herein the case, is a term in our business oriented society understood, we feel, to be subject to the ebbs and flows of the financial market and the stability of the dollar at any given time. Inherent in any "budgeted" or "scheduled" wage increase, assuming it has not been contracted for or a promised increase, is the economic status quo at the time of the proposed increase, and any *change* which may have occurred in the market from its proposal to the time of its effectuation. The mere fact of a businessman's awareness, and statements to that effect to his employees, of the possible consequences of union representation, does not support, we feel, in the absence of evidence of other antiunion activity, the inference herein made by the Board of threatening or coercive behavior constituting unfair labor practice. by the company. *Gissel, supra* ; *Hecla Min. Co. v. NLRB,* 564 F.2d 309, 315 (9th Cir. 1977).

Similar testimony has been attributed to 'one Sherrie Fendholt, a district telephone sales manager. Again the ALJ and the Board rest their inferences of the violative nature of this company representative's statements on specific utterances, taken out of context. The implications of Fendholt's reticence about the proposed wage increase, gleaned from phrases such as: subject to "extenuating circumstances," and again, "a negotiable item," are reasonably based in fact. In other words, Fendholt's awareness of the possible economic consequences in the advent of unionization in her company are, in light of the totality of the circumstances, to be expected. "[I]solated, nonthreatening statements of opinion cannot be 'transformed or transmuted by the magic of semantic labels' into threats which had significant effects upon an election." *Hecla Min. Co., supra,* at 316.

We believe it unnecessary at this time to analyze every word or phrase of contested testimony which the Board has found each to be, in and of themselves, indications of unfair labor practice. It is within this court's discretion to view the transcript as a whole and to view alleged violative communications in the context of the greater picture of accepted, vigorous campaigning by employer and union prior to representation election. *Labor Board v. Virginia Power Co.,* 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941); *Linn v. Plant Guard Workers,* 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); A. Cox, *Law and the National Labor Policy,* 42–43 (1960).

Petitioner argues that there is substantial evidence on the record as a whole to support the Board's findings of unfair labor practice. This substantial evidence is viewed in terms of "threats of reprisal" and "threats to restrict employee's benefits" should unionization become a reality, citing *Santa Fe Drilling Co. v. NLRB,* 416 F.2d 725, 728 (9th Cir. 1969); *NLRB v. Luisi Truck Lines,* 384 F.2d 842, 845 (9th Cir. 1967); *NLRB v. Otis Hospital,* 545 F.2d 252 (1st Cir. 1976); but, *cf., Wagner Industrial Products Company, Inc.,* 170 N.L.R.B. 1413; *Computer Pheriphals, Inc.,* 215 N.L.R.B. 293.

The *Santa Fe Drilling* case was decided on the basis of employer threats to withdraw *existing* benefits in the advent of unionization, and is thereby distinguishable on its facts. The wage increase herein communicated was "budgeted" and, as revealed in Fick's testimony, was subject to the "economic conditions" prevalent at the time.

In *NLRB v. Luisi Truck Lines,* this court reasoned that if the statements attributed to the employer, though the testimony was conflicting, were in fact made, a clear violation of § 8(a)(1) constituting unfair labor practice was indicated. The alleged statements in *Luisi* were of a positive, direct and threatening nature and our case is plainly distinguishable.[9]

9. *NLRB v. Luisi Truck Lines,* 384 F.2d at 845: The foreman told one group of employees that if they all were going to go union, the

company would have to get itself a new crew of drivers. He told another employee that he had to know who was going to vote for the

The *Otis Hospital* case, *supra,* on point insofar as wage increases were at issue, was decided on preexisting policies of the employer with regard to the granting of selective wage increases. The employer had posted a memorandum which, prior to the union's appearance, *promised* a "Cost of Living Raise." The employer in *Otis* attempted to blame the failure of his granting this increase to his uncertainty of its propriety during a union election campaign. The court found, however, that the employer's refusal of an offer by an employee to secure a letter from the union to seek the latter's approval of the increase was a § 8(a)(1) violation. No such promise *nor* any offer to seek approval of a "budgeted" wage increase exists here. Viewed in the context of the circumstances prior to the election of November 7, 1975, statements herein attributed to division sales managers, district sales managers, and division sales representatives were all, in point of fact, unique on the issue of the "budgeted" increase; the ALJ and the Board nevertheless inferred unfair labor violation.[10]

■ The mere fact of a statement's vagueness or obtuseness, even if intentional, does not warrant a necessary inference of threat or retaliation. "[A]n employer is free to tell his employees what he reasonably believes will be the likely economic consequences of unionization that are outside his control, as distinguished from threats of economic reprisal to be taken solely on his own volition." *NLRB v. River Togs, Inc.,* 382 F.2d 198, 202 (2d Cir. 1968); accord: *Hecla Min. Co., supra.* As in *NLRB v. Lenkurt Electric Co., supra,* the statements herein cited as violative of the Act were no more than an employer's rea-

sonable belief of the possible consequences of unionization. Such speech is no more a violation than the "predictions or possible disadvantages" cited in *Lenkurt Electric Co., supra.* In the *Free-Flow Packaging* case, we addressed this issue in these terms: "The reasonable expectation of the employees respecting wages cannot be said to have affected their freedom of choice unless their failure to get what they expected was read by them as a warning from the employer as to what the outcome of the election should be." 566 F.2d at 1130. We find the statements herein to be similar in nature to those before us in *Lenkurt Electric Co.* They "do not justify the strained interpretation given them by the Board, but were within the protection of the free speech provisions of the First Amendment, as implemented by § 8(c) of the National Labor Relations Act," citing *NLRB v. Laars Engineers, Inc.,* 332 F.2d 664 (9th Cir. 1964).

Petitioner argues further that "it is well settled law that the 'test of interference under § 8(a)(1) of the Act does not turn on the employer's motive or whether the coercion is successful or failed,' " citing *National Labor Relations Bd. v. Illinois Tool Works,* 153 F.2d 811, 814 (7th Cir. 1946). Petitioner has misstated the law as this court has interpreted it in recent cases before us:

[I]n our judgment the focus of inquiry must be upon what the motive of the employer in truth was and not upon what the employees might reasonably (although perhaps mistakenly) have assumed the motive to be. Only when we focus on the employer does the question become the crucial one of his antiunion intent.

---

union, because those who voted for the union would be out of a job, but that those who voted against the union had a job. . . . The president of the company told one employee that if the men "push this union thing too hard he would close the Yakima terminal and move to Oregon." ■

10. Transcript, Vol. I, p. 39:

It is axiomatic that an employer may not grant improvements in working conditions, not previously planned, in an organizational

context. It is likewise true that he is free to proceed to grant wage improvements scheduled prior to the advent of an organizational campaign. In the instant case, salary increases of $1,500 to $2,000 per year had been scheduled prior to the advent of the union campaign. Respondent then saw fit, as detailed, to hedge at times and attempted to tailor its plans to potential union demands in the advent of a union victory in the impending election.

Further, to hold that in judging employer motive one must hypothesize a case where no union is watchfully present is to ask the employer to behave in an extraordinarily disinterested fashion and to ignore a company problem that management simply cannot be expected to ignore. The question quite simply is whether the employer in good faith sought to comply with the requirements of law. *If he did, then to grant a wage increase could not constitute an effort to affect the outcome of the election.* (emphasis supplied)

*Free-Flow Packaging, supra,* at 1130.

■ There is nothing in the record before us to reveal prior antiunion animus, or motive of subversive, coercive, or retaliatory intent in the company's relations, via verbal communication, with employees, or the union, prior to the representation election. Petitioner relies on a rather narrow construction on this point when it cites, in its brief, *NLRB v. Raytheon,* 445 F.2d 272, 273 (9th Cir. 1971), citing *Gissel,* 395 U.S. at 618, 89 S.Ct. 1918:

If there is any implication [in employer's statement that the] employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

This court, in fact, had extended its quotation from *Gissel* significantly at the head to include points which alter the implications of petitioner's short-cut citation. We said earlier in the *Raytheon* opinion, citing *Gissel, supra* :

Thus an employer is free to communicate to employees any of his general views about unionization or any of his specific views about a particular union so long as the communications do not contain "a threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effect he believes

unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization.

We find nothing in the record to indicate that any of the company's representatives intended more than to infer that the advent of unionization could possibly alter the economic circumstances and possibilities at the time. An alteration, as such, cannot be said to be solely one of a management nature, as it is an obvious corollary in labor law that an employee's economic circumstances vary in direct proportion to the existence and amount of union influence. For the respondent company to be "slapped on the wrist" by the Board for statements with no illegal motive and with a substantial basis in fact (that being the common knowledge of union-management relations and their effect on economic conditions with a company), we find the Board drawing inferences of a narrow and unrealistic nature in today's business/labor society.

■ Petitioner finally attempts to impress upon the court the view in *Raytheon, supra,* that although we experienced "some difficulty with the examiner's appraisal of the quality and impact of Raytheon's statements," we nevertheless recognized "the Board's expertise and special competence in such matters." *Raytheon* does, however, include this court's view of the need to exercise discretion in the instance of obvious error by the Board:

The trial examiner found Raytheon made both threats and a promise of benefits; however, he concluded the benefit was too insubstantial to constitute the promise a violation; the Board disagreed and reversed the order to include the promise as a further violation. However, in this respect the Board was manifestly in error. There is no evidence that Raytheon made the asserted promise; what the record shows is that Raytheon reminded the employees of its existing grievance proce-

dure, not that it promised to inaugurate such a procedure.

N. 2 at 273.

Petitioner's attempt to confine this court to the Board's findings is thus without support and, as such, misplaced.

### Conclusion

When viewed within the guidelines set forth above of 1) motive, 2) reasonable basis in fact, 3) status quo, and 4) context, the statements herein labeled as violative of § 8(a)(1) of the NLRA seem significantly more protected under § 8(c) than when viewed individually and out of context. Although we feel bound by the ALJ's actual findings and credibility observations, supported in large part by the Board, we do not feel compelled to accept the inferences drawn therefrom in a vacuum, and which we find to be erroneous.

The court denies enforcement of the order of the National Labor Relations Board, with directions to reinstate the election results of November 7, 1975 as conclusive of the employees' desires on the issue of union representation. The election of November 7, 1975 was valid and, as the Board's action in ordering a new election was predicated solely upon the issues discussed herein, it follows that enforcement as to the entire order must be denied. *Hecla Min. Co. v. NLRB,* 564 F.2d 309, 316 (9th Cir. 1977).

ENFORCEMENT DENIED.

Note:

Judge Trask sat as a member of the panel in this case. After the opinion was prepared by Judge Hoffman, Judge Trask learned, for the first time, that General Telephone Directory Company was a wholly owned subsidiary of General Telephone & Electronics Co., the latter being a corporation in which Judge Trask and his wife owned stock which has since been sold. Judge Trask neither concurs nor dissents in the opinion and has not commented upon same.