**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, (UAW), Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Kawasaki Motors Manufacturing Corporation, U.S.A., Respondent–Intervenor.**

No. 86–7598.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1987.

Decided Dec. 16, 1987.

Irving M. Friedman, Katz, Friedman, Schur & Eagle, Chicago, Ill., for petitioner.

Allen R. Ferguson, Jr. and Paul J. Spielberg, N.L.R.B., Washington, D.C., for respondent.

Charles E. Sykes, Bruckner & Sykes, Houston, Tex., for respondent-intervenor.

Before WIGGINS, KOZINSKI and O'SCANNLAIN, Circuit Judges.

WIGGINS, Circuit Judge:

International Union, United Automobile, Aerospace and Agricultural Workers (UAW) petitions for review of an order of the National Labor Relations Board (Board or NLRB) dismissing an unfair labor practice complaint against Kawasaki Motors Manufacturing Corp., U.S.A. (Kawasaki). The UAW contends that Kawasaki unlawfully threatened to close its plant as part of its antiunion campaign. The Board found the preelection statements were lawful predictions of plant closure grounded on objective economic facts. We find the Board's conclusion supported by substantial evidence and affirm.

## I.

Kawasaki manufactures motorcycles and other vehicles at its plant in Lincoln, Nebraska. In 1979, in response to a UAW organizing drive, the Board held a union election at the plant which the union lost. The union filed objections to the election and the NLRB set it aside. The Board found Kawasaki violated section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) (1982), in its preelection campaign by explicitly threatening plant closure if the union won. *Kawasaki Motors Corp., U.S.A.*, 257 N.L.R.B. 502 (1981), *enforced mem.*, 691 F.2d 507 (9th Cir.1982), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983).

Before the NLRB's order was enforced, the UAW requested a new election, which was scheduled for October 21, 1982. On October 18 and 19, Kawasaki held a series of one hour meetings on company time with small groups of employees. Each meeting began with plant manager Hanson describing the plant's poor financial health. He reminded the employees about recent layoffs, work hour reductions, overstocked inventory, and losses. He explained that the plant had not shown a profit since it opened in 1975, and had its greatest loss, $9,000,000, in the prior year.

The company president Saeki said he was sent to the plant the year before to correct "some big problems," a "$36,000,000 loss in seven years," and that at that time "we had to make a decision either to change the plant to make it profitable or to close the plant." The company's parent, he explained, refused to subsidize it any further and so more losses would lead to plant closure. He noted the plant's productivity was lower than that of plants in developing countries, but had improved recently. His goal for the year was to break even. He cited slack motorcycle demand as the cause of the plant's recent financial woes, and concluded: "I do not like more new prob-

lems. Please understand our serious situation. I think at first we must survive. Survival is the most important thing."

Hanson predicted Kawasaki would find it difficult to operate under a UAW contract with restrictive job classifications because the company needed versatility in moving employees among jobs. He said the plant had until the year's end to break even or close. When employees asked him if Kawasaki would close the plant if the UAW won the election, he replied the question was a "trap" which he could not legally answer.

At the close of each meeting, Kawasaki showed a video depicting strike violence, not all involving the UAW. The video blamed the decline of the U.S. auto industry in part on the UAW's "ridiculous work rules that result in the duplication of effort and added cost." The video decried the UAW's "history of long and violent strikes" which had led to "permanent loss of jobs and permanently closed plants," noted that a third of the union's members were unemployed due to the union's stands, and warned that "it's up to you to decide whether they will continue their pattern of striking and closing plants in spite of reality."

Kawasaki issued a letter on October 19, reiterating that it had "serious" problems, warning that "the one thing we do not need now or at anytime, but especially now, is the UAW," and urging a no vote to put the company on the road to success.

The union called the election off and brought an unfair labor practice complaint. An ALJ found that Kawasaki management told its employees just before an election that its financial condition was bleak, the plant had never shown a profit but must do so by the end of the year or close, its parent company refused to accept more losses, it could not make a profit if it had to deal with the UAW, a UAW contract would deprive it of the versatility it needed to survive, and its very survival depended on the outcome of the election. The ALJ found that the video depicted the UAW as strike-happy and as the cause of plant closures, reinforcing the impression that the plant would close if the UAW won. The ALJ concluded that Kawasaki's campaign was a lightly veiled threat to close the plant if the union won that lacked an objective basis and was therefore a violation of section 8(a)(1) of the NLRA.

The Board accepted the ALJ's findings of fact but disagreed with his conclusion. The Board found that the statements at the meetings were lawful predictions of plant closure based on economic facts, the October 19 letter was lawful persuasion, and the video was protected speech. *Kawasaki Motors Mfg. Corp., U.S.A.,* 280 N.L.R.B. No. 53 (1986). The UAW then petitioned to this court for review. Although the dispute arose in Nebraska, we have jurisdiction over the petition under 29 U.S.C. § 160(f) because the UAW does business in Los Angeles.

## II.

We will affirm the Board's conclusion that an unfair labor practice was or was not committed if supported by substantial evidence in the record as a whole. *NLRB v. Anchorage Times Pub. Co.,* 637 F.2d 1359, 1363 (9th Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 137, 70 L.Ed.2d 115 (1981). When, as here, the Board accepts the ALJ's basic factual and credibility determinations, it may draw inferences and conclusions from them different from the ALJ's. *NLRB v. General Tel. Directory Co.,* 602 F.2d 912, 916 n. 7 (9th Cir.1979). If it does so, however, we engage in a more searching review of the record, *Tenorio v. NLRB,* 680 F.2d 598, 601 (9th Cir.1982), and the ALJ's findings become part of the record for review to be weighed against the evidence supporting the agency. *See Laipenieks v. I & NS,* 750 F.2d 1427, 1429–30 (9th Cir.1985).

## III.

Section 8(a)(1) of the NLRA makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7," which entitles employees to choose their own representatives. 29 U.S.C. sections

157, 158(a)(1) (1982). Section 8(c) affirms an employer's First Amendment right to express "any views, arguments, or opinion" without violating section 8(a)(1) as long as that expression contains "no threat of reprisal or force or promise of benefit." 29 U.S.C. section 158(a)(1), (c); *see NLRB v. Marine World USA*, 611 F.2d 1274, 1276 (9th Cir.1980). In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, *reh'g denied* 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 60 (1969), the Supreme Court affirmed an employer's right to freely "communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *Id.* at 618, 89 S.Ct. at 1942 (quoting 29 U.S.C. section 158(c)). We will carefully scrutinize unfair labor practices predicated on speech; the speech is privileged if it contains no threat or promise. *Marine World USA*, 611 F.2d at 1277.

At the same time, the employer's challenged statement must be evaluated in the context of the totality of the employer's conduct, *id.*, and the employer's right of free expression must be balanced against the right of employees to associate freely for purposes of collective bargaining. *Gissel Packing*, 395 U.S. at 617, 89 S.Ct. at 1941.

■■■ In light of these principles, an employer may express opinions or predictions, reasonably based in fact, about the possible effects of unionization on its company. *Id.* at 618, 89 S.Ct. at 1942. But such a prediction must be "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at." *Id.* A prediction is a coercive threat of retaliation if it implies that the employer may take an action

"solely on his own initiative for reasons unrelated to economic necessity and known only to him." *Id.*

## IV.

Kawasaki conveyed to its employees by the lecture and video the message that its economic situation was dire, it needed to become profitable by the end of the year or close, and unionization would deprive it of the versatility it needed to survive. Kawasaki was careful to avoid explicitly saying plant closure would result from unionization.[1] Nevertheless, we are mindful that employees, because of their economic dependency on their employer, tend to "pick up intended implications" from employer statements "that might be more readily dismissed by a more disinterested ear." *Gissel Packing*, 395 U.S. at 617, 89 S.Ct. at 1942. Thus as the Board concedes, Kawasaki intimated that due to the company's mounting losses and the union's inefficient work rules, a union victory might push the plant over the brink. Our inquiry is whether these statements were predictions based on economic fact or coercive threats of actions the company might take if it so chose.

In *Gissel Packing*, the Supreme Court indicated that an employer's opinion "'even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof.'" 395 U.S. at 618–19, 89 S.Ct. at 1942 (citation omitted). There, the company claimed that it was experiencing financial trouble, the strike-happy union would probably strike to obtain its unreasonable demands, and the result of a strike as local labor history indicated would likely be plant closure. *Id.* at 619, 89 S.Ct. at 1943. The Court held that the employer's statements constituted a coercive threat to close the plant, not a prediction of economic

---

**1.** The union claims the company overtly threatened plant closure by refusing to answer the question: "Would the plant close if the union won?" Hanson said the question was a "trap" that he could not legally answer. Since the only possible unlawful answer was "yes", the union argues, the clear import of the statement was

that plant closure would follow unionization. The question, however, presented the company with a Hobson's choice: "no" did not reflect its belief and "yes" exposed the company to a charge of making threats. The only truthful, safe answer was "no comment."

necessity, because the employer had no objective basis for his beliefs that the union would inevitably put forward unreasonable demands and strike or that unionization had caused other local plants to close. *Id.*

■ A prediction of plant closure is thus unlawful unless the employer can show that it is the probable consequence of unionization for reasons beyond its control. *Compare Patsy Bee, Inc. v. NLRB,* 654 F.2d 515, 517–518 (8th Cir.1981) (employer's claim that unionization would lead to loss of major customers and plant closure "reflected probable consequences of unionization" beyond employer's control); *NLRB v. Intertherm, Inc.,* 596 F.2d 267, 277–78 (8th Cir.1979) (employer's statement that he had shut down other plants for economic reasons in response to union demands lawful because it contained no suggestion that company would close plants for noneconomic reason) *with NLRB v. Price's Pic-Pac Supermarkets, Inc.,* 707 F.2d 236, 239–40 (6th Cir.1983) (threats to close store upon unionization "not factual predictions of unavoidable consequences",); *Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1136–37 (7th Cir.) (good faith concern for higher labor costs and inability to compete insufficient objective basis), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974).

### V.

■ The Board found Kawasaki's prediction of plant closure to be based on economic necessity. Kawasaki documented its economic concerns with detailed financial information showing heavy losses. An employer is privileged to warn its employees truthfully of its precarious financial condition, even if its purpose for the disclosure is to discourage unionization. *See, e.g., NLRB v. TRW–Semiconductors, Inc.,* 385 F.2d 753, 757–59 (9th Cir.1967) (no unlawful threat of plant closure to mention "precarious financial position"). But an employer that predicts unionization will cause plant closure cannot rely exclusively on its financial condition, but must further show that plant closure is the demonstrably probable consequence of unionization. *Gissel*

*Packing,* 395 U.S. at 619, 89 S.Ct. at 1943 (suggestion of financial trouble insufficient to justify threat of plant closure).

The Board found that Kawasaki lawfully predicted that the union's restrictive work rules would reduce the company's flexibility, threaten its profitability, and—in light of its precarious financial condition—likely push it over the edge. *Kawasaki,* 280 N.L.R.B. at —— n. 4 & —— n. 8. Both the lecture and the video presentation emphasized the company's fear of being subjected to the rigid work rules contained in the union's standard contract.

■ The prediction about the adverse economic impact of compliance with the union's standard job classifications was based on objective circumstance beyond the company's control. Kawasaki had experience with the economic advantage of flexibility in moving its employees from one job to another. It was familiar with the problem of underutilization of labor its competitors experienced under union contracts containing rigid work rules. A company's pre-election statement about potential loss of business health due to union work restrictions is a permissible comment on possible outgrowth of unionization, not an unlawful threat. *Tri–Cast, Inc.,* 274 N.L.R.B. 377 (1985). Furthermore, the employer has the right under section 8(c) to comment on the reasonably expected adverse consequences of compliance with standard union contracts. *See, e.g., TRW Semiconductors,* 385 F.2d at 760 (union expected to insist on its standard union security clause). *But see Nebraska Bulk Transport, Inc. v. NLRB,* 608 F.2d 311, 314–15 (8th Cir.1979) (employer's statement that union contract would entail increased costs and loss of flexibility which could ultimately lead to plant closure, while sounding "fairly innocuous," was in context of other explicit threats a "hard line threat to close operations").

The union claims that the Board failed to give adequate weight to the company's 1979 section 8(a) unfair labor practice. In its decision, the Board simply said that in the earlier case Kawasaki's "threats were direct and specific, not based on objective

criteria as here." *Kawasaki*, 280 N.L.R.B. at ——, n. 7. The union argues that the Board should have considered whether in view of the earlier explicit threats employees would understand otherwise innocuous statements as threatening. *See Marine World USA*, 611 F.2d at 1277 (employer's statement must be considered in context and in view of all of the employer's conduct). We agree that the employees would be more prone to understand Kawasaki's presentation as predicting plant closure due to unionization in light of the company's past conduct. However, we find that any such prediction was based on objective circumstances beyond Kawasaki's control and was therefore protected speech.

The UAW argues that the video's reference to the union's history of violent strikes, which had led to "permanently closed plants," and its warning that the UAW might continue its "pattern of striking and closing plants in spite of reality," created the impression that the union would unreasonably strike and close the Kawasaki plant. This, the union argues, is based on the same speculative assumptions that the Supreme Court found objectionable in *Gissel Packing*. The Board found the video was "expository in nature," containing truthful information about the union's history. Unlike in *Gissel Packing*, the video did not imply that the union would make unreasonable demands on Kawasaki, inevitably resulting in a strike and plant closure. Moreover, the video's statements are relatively innocuous in light of Kawasaki's overall objective presentation. Employees are accustomed to such election hyperbole and, we suspect, would not give it too much credence. *Compare Louisberg Sportswear Co. v. NLRB*, 462 F.2d 380, 385–86 (4th Cir.1972) (lawful to truthfully depict strike violence and plant closures at other companies because no suggestion that employer would retaliate against employees for unionization) *with U.S. Elec. Motors v. NLRB*, 722 F.2d 315, 321–22 (6th Cir.1983) (unlawful to predict that because union had struck at employer's other plants, unionization would inevitably lead to strikes), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2659, 81 L.Ed.2d 365 (1984); *NLRB v.*

*Four Winds Indus.*, 530 F.2d 75, 78–79 (9th Cir.1976) (unlawful to claim that union would demand union security and strike, and employees would be permanently replaced).

If "there are conflicting interpretations of the facts, and the one adopted by the Board is supported by substantial evidence," we may not substitute our own interpretation. *Anchorage Times Pub. Co.*, 637 F.2d at 1363. There is substantial evidence that the company properly told its employees about its financial predicament and lawfully predicted that union work rules would make the labor force less flexible and would decrease its profitability. Although the company suggested in the video that the UAW might strike and cause a plant closure, that statement was relatively innocuous in light of its entire presentation. We find the Board has substantial evidence to support its conclusion that Kawasaki lawfully predicted unionization would cause plant closure.

## VI.

■ The union also complains about several other preelection actions of the employer. In response to questions at one of the captive audience meetings, Hanson stated that bargaining would start "from scratch" if the union were elected. The ALJ found this statement to be an unlawful threat to reduce benefits under section 8(a). The Board correctly concluded that Hanson's statement was an innocuous, isolated and off the cuff remark that did not constitute a statement of company policy and simply reflected the uncertainty of give-and-take collective bargaining. *General Tel. Directory Co.*, 602 F.2d at 916 (statements that company would start from "blank piece of paper" and would engage in "horse-trading" were innocuous and fair comment under section 8(c)).

■ Over a week before the election, Kawasaki issued a leaflet concerning the effect of unionization on its work reduction procedures. The leaflet claimed that under the UAW contract then in effect at a Honda plant, Kawasaki would in the event of a

work reduction be required to lay off its most junior workers rather than reduce the workweek of its entire work force. The company had just reduced the workweek across the board, avoiding layoffs. The union complains that the leaflet unlawfully threatened layoffs under section 8(a). The ALJ and the Board properly disagreed. The leaflet contains no implied threat of layoff in retaliation for unionization. It merely describes the consequences of application of the union's layoff procedures and is thus a fair comment on the union's standard contract under section 8(c).

## VII.

We AFFIRM the Board's order finding Kawasaki's statements to be protected speech under section 8(c) of the NLRA and DENY the UAW's petition for review.