HECLA MINING COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 76–2382.

United States Court of Appeals, Ninth Circuit.

Nov. 8, 1977.

---

1. *See* N.R.S. 11.190(3)(a), and Cal. Civ. Proc. Code § 338(1); N.R.S. 11.190(4)(a), and Cal. Civ. Proc. Code § 339; N.R.S. 11.190(4)(c), and Cal. Civ. Proc. Code § 340.

Leonard L. Pickering (argued), of Pickering & Mahon, Albuquerque, N. M., for petitioner.

Richard A. Cohen (argued), Washington, D. C., for respondent.

Before GOODWIN and SNEED, Circuit Judges, and HAUK *, District Judge.

SNEED, Circuit Judge:

This case is before us on petition for review, pursuant to Sec. 10(f) of the National Labor Relations Act (NLRA), of the final order of the National Labor Relations Board issued against Hecla Mining Company, which found that Hecla had committed unfair labor practices at its Lakeshore Project located south of Casa Grande, Arizona. The case requires us to assess conduct attributable to an employer in the course of a representation campaign in light of the restrictions imposed by the NLRA. For reasons set out below we decline to enforce the Board's order.

## I.

### Background of the Case.

In elections held in 1971 and 1972, the production and maintenance employees of the Lakeshore Project rejected representation by five unions.[1] A third election was held on April 19, 1973 in which the unions were again defeated, this time by a vote of 238 to 229. Shortly after this third election, the unions filed objections to conduct which allegedly affected the election results. The Regional Director found that several of the objections presented substantial issues which merited a hearing, which was ordered and held in July. In his report, the Hearing Officer overruled two of the objections, but recommended that the election be set aside on the basis of a third objection relating to the allegedly coercive conduct of two individuals, Olson and Huntington.

The Officer concluded that Olson and Huntington, who were classified as "lead men," were actually supervisors within the meaning of the NLRA. He then found that the two had conducted unlawful interrogation and had threatened two employees with loss of benefits and employment, thereby interfering with the employees' making a "free and untrammelled choice in the election." The Board adopted the conclusions of the Hearing Officer and ordered a new election, which was held on March 6, 1974. The unions won this election by a vote of 329 to 291.

To this fourth election Hecla filed six objections. The Regional Director concluded after an investigation that two of those objections merited a hearing. The Board in a second supplemental decision granted a hearing,[2] which took place in July 1974. In his report the Hearing Officer rejected all the objections of the Company. In its third supplemental opinion, the Board adopted the conclusions of the Hearing Officer, with exceptions not relevant here.[3] It then certified the unions.

Disputing the unions' authority, the Company refused to bargain. The Board thereupon found that such refusal constituted an unfair labor practice.

The issue on appeal, then, is whether the Company's refusal constituted an unfair labor practice in violation of Sec. 8(a)(1) and (5) of the NLRA. This depends upon whether the Board's certification of the unions is valid, which in turn depends upon whether the Board erred (1) in setting aside the 1973 election and (2) in refusing to set aside the 1974 election. As we conclude that the 1973 election was valid and should not have been overturned, we decline to

* Hon. A. Andrew Hauk, United States District Judge for the Central District of California, sitting by designation.

1. National Steelworkers of America; International Union of Operating Engineers, Local 428; International Brotherhood of Teamsters, etc., Local 310; Laborers District Council, State of Arizona, Local 479; and International Brotherhood of Electrical Workers, Local 570—herein referred to as the unions or union.

2. On the basis of interviews conducted in preparation for a hearing, the Company filed a motion alleging that it had discovered new evidence of misconduct by Board agents and union overseers and agents. The Board granted a hearing on both the two allegations sustained by the Regional Director and the new allegations of the Company.

3. It held that the additional objections of the Company, supra n.2, had not been filed timely and should not have been considered.

enforce the Board's order and do not pass on the merits of the objections to the fourth election.

## II.

### Standard of Review.

█ There is no direct appeal from a decision of the Board with respect to representation elections.[4] As in this case, review typically occurs when an employer appeals the Board's decision that its refusal to bargain with a union constitutes an unfair labor practice. *Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971); *McCulloch v. Libbey-Owens-Ford Glass Co.*, 131 U.S.App.D.C. 190, 403 F.2d 916 (1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969). *Cf. Associated General Contractors of California, Inc. v. NLRB*, 564 F.2d 271 (9th Cir. 1977).

█ Although the entire record is then reviewable, *Trailmobile Division, Pullman, Inc. v. NLRB*, 379 F.2d 419 (5th Cir. 1967), the standard of review is circumscribed. *Coronet-Western v. NLRB*, 518 F.2d 31 (9th Cir. 1975); *I.T. & T. Corp. v. NLRB*, 294 F.2d 393 (9th Cir. 1961). As we noted in the latter case, the Board is presumed to have a certain expertise in conducting and evaluating elections; its decisions should be deferred to unless it has committed an abuse of discretion. Findings of fact should be conclusive if supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This court uniformly has made

a close examination of the record to determine whether in fact the conclusions of the examiner and the Board are fairly supported by the record, *e. g. NLRB v. Sauk Valley Manu. Co.*, 486 F.2d 1127 (9th Cir. 1973); *Sonoco Products v. NLRB*, 443 F.2d 1334, 1336 (9th Cir. 1971); *NLRB v. Lenkurt Electric Co.*, 438 F.2d 1102 (9th Cir. 1971); *Don The Beachcomber v. NLRB*, 390 F.2d 344 (9th Cir. 1968).

## III.

### Regulation of Pre-election Conduct.

A. Background.

█ Because of the potential for overreaching by both employers and unions, Congress in the pre-election conduct setting has limited the freedom of speech which generally prevails in other contexts.[5] In enacting Sec. 8(c) as an amendment to the NLRA in 1947, however, Congress undertook to design the restraints in a manner that would encourage free debate and more adequately protect the First Amendment rights of employers and unions.[6] *Linn v. Plant Guard Workers*, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). Only those restrictions are imposed which are essential to permit a free choice in voting; an employee's vote should neither be coerced nor based on an uninformed choice. Evaluation of pre-election conduct requires that a balance be struck that prevents coercion and maximizes information.

4. Subject to some limited exceptions, *e. g. Herald Co. v. Vincent*, 392 F.2d 354 (2d Cir. 1968).

5. Statutorily those restrictions are contained in Sec. 8(a)(1) of the NLRA which provides that it shall be an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). Section 7 guarantees the right "to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, . . . ." 29 U.S.C. § 157.

6. Sec. 8(c) of the NLRA provides that "[t]he expressing of any views, argument, or opinion,

or the dissemination thereof, . . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of [this Act], if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). This section was enacted in part to redress what was believed to be an imbalance against employers and in favor of unions and to define the First Amendment rights of both. *See NLRB v. TRW-Semiconductors, Inc.*, 385 F.2d 753 (9th Cir. 1967). Relevant also to the balancing of interests is the employee's "right to refrain from any or all" union activities, guaranteed by Section 7. 29 U.S.C. § 157.

B.  Test.

In order for an election to be overturned, there must be (1) proscribed conduct (2) which conduct prevented the employees from "freely registering their choice of a bargaining representative." [7] *Sonoco Products v. NLRB, supra.* Prior cases provide a number of touchstones in applying this test. As to the first part— whether the speech constitutes proscribed conduct or not—the Supreme Court has specifically classified certain types of speech as permissible and impermissible. As to the second part of the test—the impact of the proscribed conduct—factors to be considered include the rank of the individual who engaged in the conduct, whether the employer or the employee initiated the communication, the total background of all pre-election conduct, and of course any evidence directly suggesting that the conduct had either an isolated or a pervasive impact.

Applying the test to the facts applicable to the 1973 election, we first conclude that the challenged speech was in part protected and in part unprotected. We further conclude, however, that the impact of the speech was entirely isolated and that the speech could in no way have affected the outcome of the election.

C.  Application of the Test.

1.  Proscribed Conduct.

Our standard for determining whether certain pre-election speech constitutes proscribed conduct is found in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and was analyzed by this circuit in *Lenkurt Electric Co., supra.* These authorities establish that the employer is free to express opinions with respect to the consequences of unionization which have some reasonable basis in fact. Threats, veiled or direct, are proscribed. The line between proscribed threats and permissible predictions was drawn in *Lenkurt Electric Co., supra,* as follows:

It appears clear that an employer may not make predictions which indicate that he will, of his own volition and for his own reasons, inflict adverse consequences upon his employees if the union is chosen. This would constitute a threat of retaliation. Also, an employer may not, in the absence of a factual basis therefor, predict adverse consequences arising from sources outside his volition and control. This would not be a retaliatory threat, but would be an improper restraint nevertheless. *N.L.R.B. v. C. J. Pearson Co.*, 420 F.2d 695 (1st Cir. 1969). Thus, an employer may not impliedly threaten retaliatory consequences within his control, nor may he, in an excess of imagination and under the guise of prediction, fabricate hobgoblin consequences outside his control which have no basis in objective fact.

438 F.2d at 1106.

Application of these guides to the statements which Olson, a low-level supervisor, made to employee, Dippel, suggests that some transgressed the bounds of protected speech. Olson suggested that the union would not help the workers because they already had everything they could hope for. (Tr. 98). Judging from the record, this would appear to be an opinion without a reasonable basis in fact, as the Hearing Officer concluded. At the very least it may be considered a "hobgoblin consequence." On the other hand, the statement that the union was a "bad deal" because workers were paid better at Hecla

---

7.  Cases in this circuit have not phrased the test uniformly. In *NLRB v. Sauk Valley Manufacturing Co., Inc.*, 486 F.2d 1127 (9th Cir. 1973), quoting *Hollywood Ceramics Co., Inc.*, 140 NLRB 221, 224 (1962), we stated that an election should be overturned where the proscribed conduct "may reasonably be expected to have [had] a significant impact on the election." In *NLRB v. G. K. Turner Associates*, 457 F.2d 484, 487 (9th Cir. 1972), we stated that the proscribed conduct must have "significantly impaired the election process."

In the light of our conclusion, *infra*, that the challenged conduct had no effect upon the outcome of the election and may not have had any effect even on the two employees involved, it is not necessary for us to decide whether the impact must be upon the employees or the election or both.

than those at six other mines, worse than those at one mine and the same as those at another mine (Tr. 98) is merely a statement of fact. Similarly a statement that the free transfer policy of the company between work sites might be incompatible with the union structure, under which different unions, each with its own seniority system, organized different sites, is a factually-based opinion. *See NLRB v. Lenkurt Electric Co., supra.*

■■■■ Another example of an opinion reasonably based on fact is that by Huntington, another low-level supervisor, to employee Reed to the effect that the latter might not obtain the front loader job he wanted because that position would be under the jurisdiction of a different union. (Tr. 85). Although the Hearing Officer concluded this constituted a threat, we think otherwise. It is an opinion framed as a prediction of adverse consequences arising from sources outside the employer's control which is reasonably based on fact. Other comments made by Huntington to Reed are improper, however. Huntington's conclusion that paid vacations would end if the union came in are not reasonably based on fact. Nonetheless, Huntington, as we shall see, was in no position to formulate company policy with respect to vacations.

## 2. Impact.

Despite the fact that we agree with the Hearing Officer to the extent of acknowledging that certain statements by Olson and Huntington constituted "threats," albeit mild ones indeed, we believe these statements had no impact on the employees and no effect on the outcome of the election.

Three factors convince us of this. First, the statements were made by low-level, marginal supervisors. Such statements are more likely to express individual views and less likely to influence the employee's decision than statements by high-level officials which bear the imprint of company policy. Although the importance of the status of the speaker has been well-established by prior cases, *NLRB v. Huntsville Manu. Co.,* 514 F.2d 723 (5th Cir. 1975); *Utrad Corp. v. NLRB,* 454 F.2d 520 (7th Cir. 1971); *NLRB v. Hotel Conquistador, Inc.,* 398 F.2d 430 (9th Cir. 1968), the Hearing Officer failed to analyze the status of Olson or Huntington and concluded that they were "responsible members of management" whose views "had a corresponding weight." (H.O.R. 79–80).[8]

■■■■ This conclusion is without support in the record. Olson and Huntington were classified as "lead men" who were permitted by the unions to vote in the election. They exercised certain of the powers of a supervisor. (H.O.R. 65–73). They had, for example, the power to recommend raises and promotions, although the final power of decision lay with higher officials. (H.O.R. 68). The extent of their power to recommend lay-offs and demotions is in conflict. (Tr. 66, 67, 69). They instructed other workers in the use of equipment and appear to have had, in the absence of higher authority, the power to make some nonroutine decisions. (H.O.R. 68). These facts may support a finding that Olson and Huntington qualified as supervisors but they by no means demonstrate that they were "responsible members of management" whose views "had a corresponding weight." (H.O.R. 79–80). They were in fact marginal supervisors whose influence must be discounted accordingly.

■■■■ Secondly, the statements challenged constitute the only evidence of anti-union activity. *Lenkurt* requires that we consider not only the individual statements *in vacuo,* and their source, but also the background of all other conduct which preceded the election. 438 F.2d at 1107. The absence of evidence of other anti-union activity implies that Olson's and Huntington's statements reflected their personal opinion and not company policy. The Hearing Officer's analysis ignored this implication.

■■■■ Finally, the record presents direct evidence that the statements were iso-

---

8. Hearing Officer's Report, Record, vol. I.

lated and had no impact. The Huntington-Reed conversation took place while the two were in a truck (Tr. 84); the Olson-Dippel conversation occurred in an office, and was initiated by Dippel (Tr. 98, 109). The record suggests that neither employee was influenced by the remarks (Tr. 91, 112, 116); it is devoid of any hint that anyone else overheard or was told of the conversations. The Hearing Officer's conclusion that "the statements to Reed and Dippel, though seemingly isolated, had a significant effect on other voting unit employees as well" (H.O.R. 80) is simply unsupported by the record. It is a conclusory judgment which tracks the case law requirement for overturning the election. *See also* H.O.R. 79, 80. We reiterate our conclusion in *Salinas Valley Broadcasting Corp. v. NLRB*, 334 F.2d 604 (9th Cir. 1964) that isolated, non-threatening statements of opinion cannot be "transformed or transmuted by the magic of semantic labels" into threats which had significant effects upon an election.

## IV.

### CONCLUSION.

For these reasons we decline to enforce the Board's order. The 1973 election was valid. To hold otherwise either would unduly restrict debate in representation campaigns or provide a means for setting aside almost all elections in which the employees voted against union representation. We cannot believe that unions seeking to represent workers require such advantages and we are confident that Congress did not intend that they exist.

ENFORCEMENT DENIED.