**NEBRASKA BULK TRANSPORT, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1138.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1979.

Decided Nov. 2, 1979.

---

312

John M. Guthery, Perry, Perry, Witthoff & Guthery, Lincoln, Neb., for petitioner.

Lawrence J. Song, Atty., N. L. R. B., Washington, D. C., for respondent; John H. Ferguson, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on the brief.

Before BRIGHT and HENLEY, Circuit Judges, and MARKEY, Chief Judge.*

BRIGHT, Circuit Judge.

Nebraska Bulk Transport, Inc. (Employer), a trucking firm operating out of a

* HOWARD T. MARKEY, Chief Judge, United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

facility located at Bennett, Nebraska, petitions this court to review an order of the National Labor Relations Board (Board) finding the Employer guilty of several unfair labor practices. The Board cross-applies for enforcement. We grant enforcement of the Board's order except for reinstatement of driver Roger Grant.

A union membership campaign commenced in early June 1977, when employee Dennis Miller advised a business representative of the Union[1] that employees of Nebraska Bulk Transport desired union representation. Miller and another employee, Roger Grant, began soliciting union authorization cards from other drivers between June 11 and June 27, 1977.

On June 28, 1977, the Union sent a telegram advising Nebraska Bulk Transport of the union organizational campaign. Later, on August 27, 1977, the Board conducted a representation election among certain employees of Nebraska Bulk Transport. A majority of the employees in the designated bargaining unit[2] voted in favor of the Union. The Board certified the Union on September 6, 1977, as collective bargaining representative for employees in the bargaining unit.

Unfair labor practice charges against the Employer arose out of the pre- and post-election conduct of its president and managing officer, Dean Peterson. The charges fall into three general categories:

1) The Employer violated section 8(a)(1) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) (1976), in the following regards, as determined by the administrative law judge and adopted by the Board:

By interrogating the wife of an employee on or about June 30, 1977, and by interrogating an employee on various dates after July 5, 1977, regarding the union activities of the employees of the [Employer]; by engaging in surveillance of the union activities of its employees on various dates after July 5, 1977; by threatening its employees that the [Employer] would close its facility, sell its trucking equipment, and lease its hauling operations to lease operators because of its employees' selection of the Union as their collective-bargaining representative, during conversations occurring in the week of July 11, 1977 and the week of August 29, 1977; by threatening its employees that the signing of a union contract could mean the closing of [Employer's] operation, in a letter to its employees a week or 10 days prior to August 27, 1977, and by threatening its employees that it would refuse to bargain with the union selected by the employees as their collective-bargaining representative, in a conversation on or about July 6, 1977[.]

2) The Employer violated sections 8(a)(3) and 8(a)(1) of the Act, 29 U.S.C. §§ 158(a)(3) and 158(a)(1) respectively, by terminating employees Dennis Miller and Roger Grant on or about June 5, 1977, because of their union activities.

3) The Employer engaged in unfair labor practices within the meaning of sections 8(a)(5), (3) and (1) of the Act, 29 U.S.C. §§ 158(a)(5), 158(a)(3), and 158(a)(1) respectively, in the following regards, as determined by the administrative law judge and adopted by the Board:

By making changes in the work assignments of unit employees and by subcontracting a portion of the unit work, and thereby adversely affecting the conditions of employment of Nick Bolejack, Sam Contreras, Ronald Grant and Robert Herrington since on or about September 1, 1977, because of its employees selecting the Union as their collective-bargaining representative, and doing so unilaterally without notice to and bargaining with the Union, as the collective-bargaining representative of the employees in the unit described above, and by continuing to

---

1. General Drivers and Helpers Union Local 544, Affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union).

2. The unit included full and part-time drivers, maintenance employees, and dispatcher; it excluded office clerical employees, professional employees, guards, lease operators, and supervisors.

refuse to bargain collectively with the Union regarding the use of lease operators and the subcontracting of unit work[.]

The Board ordered the Employer to cease and desist from these unfair labor practices and from otherwise interfering with the employees' exercise of their rights under the Act. In addition, the Board adopted an affirmative remedy requiring the Employer to reinstate the discharged employees, Miller and Grant; to reimburse certain employees for earnings lost when the Employer changed work assignments and subcontracted some of its work without bargaining with the Union; to bargain with the Union upon request; and to post appropriate notices.

We deem it unnecessary to discuss in this opinion all of the charges made against the Employer resulting in the Board's unfair labor practice findings. On an examination of the record, giving due regard to credibility findings made by the administrative law judge, we conclude that the Board's findings are well supported by the evidence and that we need discuss only two matters in some detail: a preelection letter sent by Peterson to the employees and the reinstatement of employee Roger Grant. We turn to those issues.

I. *The Preelection Letter.*

President Peterson arranged for the delivery of a letter to each employee about seven to ten days before the election. The letter comprised three and one-half pages, typed and double spaced; it detailed the financial condition of the Employer and contained a summary financial statement as an attachment. The following statement appeared at the top of the third page of the letter:

If a union contract is signed, I believe that increased costs and loss of flexibility will require changes in methods of operations in order to remain economically sound, and if those changes are not successful, the signing of a union contract could mean the closing of our operation.

The Board characterized this language as a threat to the employees that the signing of the union contract could mean the closing of the Employer's operations, and concluded that such a message violated section 8(a)(1).

■ Whether an employer's expression of objections to unionization of the employer's work force constitutes protected speech or an unlawful threat of reprisal to employees for supporting the union must be judged by the standards summarized in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In *Gissel, supra,* the Court observed that

an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board. Thus, § 8(c) (29 U.S.C. § 158(c)) merely implements the First Amendment by requiring that the expression of "any views, argument, or opinion" shall not be "evidence of an unfair labor practice," so long as such expression contains "no threat of reprisal or force or promise of benefit" in violation of § 8(a)(1). Section 8(a)(1), in turn, prohibits interference, restraint or coercion of employees in the exercise of their right to self-organization.

Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. [*Id.* at 617, 89 S.Ct. at 1941–1942.]

We have discussed the employer's prerogative of free speech in a number of cases,[3]

---

3. *See, e. g., NLRB v. Saunders Leasing System, Inc.,* 497 F.2d 453 (8th Cir. 1974); *Wilkinson* *Mfg. Co. v. NLRB,* 456 F.2d 298 (8th Cir. 1972); *Ace-Alkire Freight Lines, Inc. v. NLRB,* 431

most recently in *R. J. Lallier Trucking v. NLRB,* 558 F.2d 1322, 1327 (8th Cir. 1977), where Judge Henley, writing for the court, observed that the "challenged statement by an employer must be appraised in the context of its particular labor relations setting." Here, the statement challenged on its face appears fairly innocuous, except for some vagueness about required "changes" which, if not successful, could mean the closing of the plant. In context, however, this latter can be construed as echoing a hard line threat to close operations if the Union won the election.

■ On July 7, 1977, prior to the election, President Peterson talked to truckdriver Bolejack about the Union. According to Bolejack, Peterson said, "I'm not going to negotiate with the Union." According to Peterson's version, he told Bolejack that organization of the Union would force Peterson into a· reassessment of operations, and that high losses due to maintenance would require selling off the trucks and obtaining lessee-operators or selling the business. A few weeks later, on July 11, 1977, Peterson, in the presence of two truckdriver employees stated: "If you guys want the Union in, that is your prerogative, but I know what I'm going to do, I am going to sell out and close the doors."

Given this employer-employee dialogue, the record supports the Board's characterization of the letter as conveying a threat of retaliation based on misrepresentation. Peterson's work force well may have understood the vague language quoted from the letter as threatening, not predictive. *See NLRB v. Crystal Tire Co., supra,* 410 F.2d at 918. Accordingly, we sustained the Board's determination that the letter violated section 8(a)(1) of the Act.

## II. *Reinstatement of Grant.*

■ Grant began working for the Employer as a truckdriver on May 3, 1977. In his application he disclosed two speeding violations in 1975 and no driving offenses over the previous twelve months. The Employer requested a driving record on Grant from the Nebraska Highway Department. The state's record revealed five speeding violations, one in 1973, two in 1975, and two in 1976.· Each of the violations except one in 1975 resulted in the assessment of three points[4] chargeable against Grant's driving license. One of the 1975 violations cost Grant two points.

Peterson discussed Grant's driving record with the agent for his liability insurer. According to testimony given at trial, the insurance agent advised Peterson that the insurer would not extend coverage to the Employer for Grant's operation of trucks. At Peterson's request, the agent confirmed his opinion in a memorandum. That memorandum stated in pertinent part:

> Per our conversation of 7–5–77 regarding the driving record of Roger Grant. With 4 violations in the past 3 years he does not meet our underwriting requirements and we would ask that you sign a restriction, (voiding any coverage while he was driving) if he is to remain in your employment. Please advise if he continues his employment with you.

In a second memorandum the agent commented on the driving record of three other drivers, noting that the driving records of two of them were questionable for underwriting purposes.

After his conversation with his insurance agent, but before receiving the written confirmation, Peterson wrote Grant a letter terminating Grant's employment because of his poor driving record and consequent un-

F.2d 280 (8th Cir. 1970); *NLRB v. Crystal Tire Co.,* 410 F.2d 916 (8th Cir. 1969); *NLRB v. Hawthorn Co.,* 404 F.2d 1205 (8th Cir. 1969).

4. Nebraska's point system for prevention and elimination of successive traffic violations is set out in Neb.Rev.Stat. §§ 39–669.26–39–669.-36 (Reissue 1978). Basically, the statutes assign a number of points to various motor vehi-cle offenses—*e. g.,* speeding more than 10 miles per hour over the speed limit, three points. When an operator accumulates a total of 12 or more points within any period of two years, the Director of Motor Vehicles will summarily revoke the offender's privilege to operate a motor vehicle in Nebraska.

insurability, stating that "[Y]ou have only 1 point left on your license[.]" [5]

The Employer introduced an opinion of counsel given to Peterson on July 7, 1977, that Interstate Commerce Commission regulations required insurance on all vehicles. The opinion stated that "if your insurance carrier will not cover certain units * * * because of a driver's poor driving record * * * you are in violation of interstate commerce insurance regulations which could of course jeopardize the continued operation of your operating authority."

Notwithstanding these apparently adequate grounds to discharge Roger Grant, the administrative law judge concluded that the Employer was motivated to terminate Grant in part because of union activities. The administrative law judge inferred from the evidence that Peterson had specially investigated Grant's driving record after learning of his prounion activity, and that he had then made arrangements to obtain documentation of Grant's uninsurability in a manner different from other drivers whose records were forwarded to the underwriter. In finding union animus, the administrative law judge relied upon other 8(a)(1) violations as well as a statement Peterson allegedly made to one of the truck drivers in mid-July that "I think I got rid of the ones that started it."

The Board accepted the administrative law judge's characterization of Peterson's actions and motives. Having concluded that the Employer violated sections 8(a)(3) and (1) by acting upon an impermissible motive in discharging Roger Grant, the Board ordered the Employer to reinstate Grant. In this petition for enforcement, the Board in its brief recognizes the paradox of ordering reinstatement of a driver who, under the evidence, cannot be insured. As a solution the Board suggests that the Employer's objection to rehiring an unsafe and uninsurable driver may be deferred for consideration in the compliance stage of the proceeding.

We do not agree with this resolution of the Roger Grant matter. The Board has determined that the Employer desired to get rid of Grant as a union organizer. In reaching that conclusion the Board, in agreement with the administrative law judge, resolved every credibility issue against the Employer and similarly drew adverse inferences of antiunion motivation from the Employer's manner of investigating Grant's driving record, although the Employer usually investigated driving records of its employees.

We may agree with the Board that the Employer was happy to have a valid reason to discharge Grant. Yet the fact remains that any employee, prounion or not, possessing a driving record like Grant's could not drive for the Employer because its liability insurer would not extend coverage to that driver. The record stands undisputed that Grant himself could not qualify for coverage under the Employer's liability insurance policy. Under these circumstances, reinstatement does not constitute an appropriate remedy and is not required.

Although we are usually obligated to defer to the Board's discretion in ordering a reinstatement remedy, the rule is not inflexible and situations do exist which justify rejection of a reinstatement remedy. See NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939) (employer guilty of unfair labor practices need not reinstate union employee who has committed an illegal act); accord, NLRB v. Big Three Welding Equipment Co., 359 F.2d 77 (5th Cir. 1966); NLRB v. Potter Electric Signal Co., 600 F.2d 120 (8th Cir. 1979). Cf. Berbiglia, Inc. v. NLRB, 602 F.2d 839 (8th Cir. 1979) (concerning evidence of disparate treatment of union and antiunion employees overcomes nominal justification for discharge).

In circumstances quite analogous to those before us, the Fifth Circuit held that the company need not reinstate an unlawfully discharged truckdriver where the record disclosed that the driver's safety record

---

5. Peterson admitted an error in point calculation. Apparently four points remained on Grant's license before it could be cancelled. See discussion at note 3 supra.

(five traffic violations during a nineteen-month period, plus an additional violation during current employment) did not meet the employer's standards. *NLRB v. Big Three Industrial Gas & Equipment Co.*, 405 F.2d 1140 (5th Cir. 1969). The court said:

Under the circumstances of the present case we are not willing to force the Company to reinstate a truck driver with such a bad record of traffic violations. Compulsory reinstatement would do violence to the safety policy of the Company, which experienced two major truck collision losses immediately prior to Marsh's discharge. More important, his reinstatement would be incompatible with the safety on the public highways. [*Id.* at 1143.]

In our view, the reasoning of the Fifth Circuit in *Big Three Industrial Gas & Equipment* is sound. We apply that principle here and deny the reinstatement remedy for Roger Grant.

Accordingly, we enforce the Board's order save for reinstatement of Roger Grant.