MOUNT PLEASANT COMMUNITY SCHOOL DISTRICT, Appellee,

v.

PUBLIC EMPLOYMENT RELATIONS BOARD, Appellee, and Mount Pleasant Para-Professionals, Aides, Secretaries Organization, Appellant.

Appeal of MOUNT PLEASANT PARA-PROFESSIONALS, AIDES, SECRETARIES ORGANIZATION.

No. 83–56.

Supreme Court of Iowa.

Jan. 18, 1984.

Charles E. Gribble and Gerald L. Hammond of Sayre & Gribble, Des Moines, for appellant organization.

John R. Phillips and Susan R. Flander of Rogers, Phillips & Swanger, Des Moines, and Ernest F. Pence of Hines, Pence, Day & Powers, Cedar Rapids, for appellee district.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McCORMICK and WOLLE, JJ.

UHLENHOPP, Justice.

In this appeal we decide whether substantial evidence exists to support a holding by the Iowa Public Employment Relations Board (PERB) invalidating a representation election on the basis of conduct of the employer. The appeal comes to us in the context of a contested case under the Iowa Administrative Procedure Act (IAPA), chapter 17A of the Iowa Code (1981).

In June 1981, several nonteaching employees of the Mount Pleasant Community School District (district) who were members of the Para-Professionals, Aides, Secretaries Organization (organization) petitioned PERB to conduct a representation election. On October 6, 1981, PERB conducted the election, which the organization lost by a vote of ten to twelve.

The organization challenged the result. It claimed that a notice posted on October 5, 1981, some thirty hours before the election, misrepresented material facts and threatened organization members with loss of employment if the union won the election. The notice was posted by Superintendent Richard Goodwin of the district in each of the school buildings where members of the organization were likely to see it. The notice was the only campaign statement made by the district. It read:

NOTICE

Secretaries, Aides, Para-Professionals

FACTS TO BE CONSIDERED
BEFORE YOU VOTE

1. *If the union wins, what happens?* Many think that if the union wins the election it is an automatic contract. The law says that the School District must negotiate with the union in good faith. Good faith bargaining (includes rejecting)

a demand we feel in any way would put the school district in a bad position. That's what good faith means. The only things required by law exist. Everything is "horse trading," you might gain some things that you don't presently have, but you also might lose some things that you presently have because bargaining starts with a bare table not at where you are today.

2. *How about job security?* Certainly, unions are in no position to talk about job security. In short, unionized employers throughout the nation, when layoffs become necessary, have been forced to take layoff action. It is quite obvious that a collective bargaining agreement cannot guarantee against staff reduction —nor, for that matter, does it protect against discharge for cause. Bringing it closer to home, anyone who knows us must agree that we do not enjoy staff reduction, but it must be recognized that it is an occasional but real fact of life in the school business when our enrollment is declining.

3. *How about fringe benefits?* How do your fringe benefits compare to other like job classifications in the private sector? Would they be better if you pay union dues?

4. *What does it mean if I signed an authorization card?* It means only that you are willing to have a union vote. It does not mean that you must vote for the employee organization.

5. *How have the non-certified employees salary increases compared to the certified staff over the last several years?* FACT: As a group, percentage of dollar increase has been at least as much or more every year.

6. *Importance of voting!* Under the Public Employment Relations Board procedures, you should vote if you are for the union or against the union representing you in collective bargaining. The winner of the election will be whichever received the majority of the votes *cast,* not of those eligible to vote.

REMEMBER YOUR VOTE IS A SECRET BALLOT

THANK YOU FOR TAKING TIME TO READ THIS NOTICE.

[Signed] Mr. Goodwin

The organization asserted that paragraphs 1 and 2 of the notice violated rules 660–5.4(3)(b) and (g) of the Iowa Administrative Code. Those rules read as follows:

5.4(3) *Objectionable conduct during election campaigns.* The following types of activity, if conducted during the period beginning with the filing of an election petition with the board and ending at the conclusion of the election, and if determined by the board that such activity could have affected the results of the election, shall be considered to be objectionable conduct sufficient to invalidate the results of an election:

. . .

*b.* Misstatements of material facts by any party to the election or their representative without sufficient time for the adversely affected party to adequately respond;

. . .

*g.* Any other misconduct or other circumstance which prevents employees from freely expressing their preferences in the election.

The rules were adopted to implement section 20.15(4) of the Iowa Code. That section provides:

4. Upon written objections filed by any party to the election within ten days after notice of the results of the election, if the board finds that misconduct or other circumstances prevented the public employees eligible to vote from freely expressing their preferences, the board may invalidate the election and hold a second election for the public employees.

The organization's contentions were presented to a PERB hearing officer. In his recommended decision, the hearing officer concluded that "the statements at issue do not contain any substantial misrepresentations of fact or law. . . ." He thus found that rule 5.4(3)(b) had not been violated. He further decided, however, that state-

ments in paragraph 2 of the notice pertained to job security and could have affected the outcome of the election and thus violated rule 5.4(3)(g). As to this conclusion he wrote:

> The record in this case clearly demonstrates no direct anti-union animus against the Organization. Aside from the District's initial disagreement with the Organization concerning the scope of the bargaining unit and the District's objection to the Organization affiliating with the same Association representing the District's teachers, the District had no other communication with the Organization during the organizational campaign. However, the testimony in this case also clearly demonstrates that the employees perceived the notice as a veiled threat that they would be laid off if they voted for the Organization.

On appeal, the full Public Employment Relations Board upheld the result reached by the hearing officer. The board, however, disregarded subjective testimony relied upon by the hearing officer and based its conclusion on "an objective evaluation of the notice." The board did not set forth the objective facts in the notice that led to its decision to set aside the election.

The district and the organization appealed to district court, pursuant to section 17A.19 of the IAPA. Each party contested that portion of the decision adverse to it.

Another part of chapter 20 of the Iowa Code provides in section 20.10(4):

> 4. The expressing of any views, argument or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of any unfair labor practice under any of the provisions of this chapter, if such expression contains no threat of reprisal or force or promise of benefit.

This is a parallel provision to section 8(c) of the National Labor Relations Act, 29 U.S.C. § 158(c) (1976). The district court ordered a limited remand to PERB to decide whether the statements in the notice constituted a "threat of reprisal or force or promise of benefit" under section 20.10(4). PERB decided the notice constituted a "threat of reprisal" under that section but the section was not applicable because it pertains to prohibited practices and no allegations of prohibited practices were made. The district court then affirmed PERB's conclusion under rule 5.4(3)(b) (no misrepresentations) and reversed its conclusion under rule 5.4(3)(g) (the notice was threatening and coercive). The court set aside PERB's invalidation of the election and did so on the ground that the invalidation was not supported by substantial evidence. The organization then appealed to this court. It contends in its appeal that the invalidation should be upheld under both rules 5.4(3)(b) and (g).

I. *Scope of review.* The district court reviewed PERB's decision pursuant to section 17A.19(8) of the IAPA. That review does not involve a de novo consideration of the evidence. *Cook v. Iowa Department of Job Service*, 299 N.W.2d 698, 701 (Iowa 1980). Our further review is likewise not de novo. *Id.* The question we decide is whether the district court correctly applied the law. "In order to make that determination, this court applies the standards of section 17A.19(8) to the agency action to determine whether this court's conclusions are the same as those of the district court. If the conclusions are the same, affirmance is in order. If they are not, reversal may be required." *Jackson County Public Hospital v. PERB*, 280 N.W.2d 426, 429 (Iowa 1979).

The sole provision of section 17A.19(8) raised in this appeal is clause *f.* Under that clause, the court may grant relief because the agency action is

> *f.* In a contested case, unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole; ...

*See Cook*, 299 N.W.2d at 700. The principle we have adopted for making such a determination is this:

> Evidence is substantial when a reasonable mind would accept it as adequate to

reach a conclusion.... The entire record must be considered in determining whether the challenged finding has sufficient support. Nonetheless, the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *City of Davenport v. PERB*, 264 N.W.2d 307, 311 (Iowa 1978) (citations omitted). We are not barred from setting aside an agency decision if we " 'cannot conscientiously find that the evidence supporting that decision is substantial, when reviewed in the light that the record in its entirety furnishes....' " *Id.* at 312 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456, 467–68 (1951)). *See NLRB v. Welfed Catfish, Inc.*, 674 F.2d 1076, 1078 (5th Cir.1982) ("Although we review the Board's findings only to determine whether on the record as a whole they are supported by substantial evidence, we do not act as automatons, nor may we abdicate our judicial function. The Board's findings deserve respect but do not command submission. We must make our own assessment of the reasonableness and fairness of the Board's conclusions."); *J.S. Dillon & Sons Stores Co. v. NLRB*, 338 F.2d 395, 399 (10th Cir.1964) ("a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view"); *Hecla Mining Co. v. NLRB*, 564 F.2d 309, 313 (9th Cir.1977) ("[T]he Board is presumed to have a certain expertise in conducting and evaluating elections; its decisions should be deferred to unless it has committed an abuse of discretion. Findings of fact should be conclusive if supported by substantial evidence.").

■ Underlying all of these representation election cases, of course, is the right of free speech guaranteed by the first amendment to the United States Constitution. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *Dal-Tex Optical Co.*, 137 NLRB 1782, 1787 (1962) ("the strictures of the First Amendment, to be sure, must be considered in all cases"). In *Gissel* the employer's conduct involved the following:

When petitioner's president first learned of the Union's drive in July, he talked with all of his employees in an effort to dissuade them from joining a union. He particularly emphasized the results of the long 1952 strike, which he claimed "almost put our company out of business," and expressed worry that the employees were forgetting the "lessons of the past." He emphasized, secondly, that the Company was still on "thin ice" financially, that the Union's "only weapon is to strike," and that a strike "could lead to the closing of the plant," since the parent company had ample manufacturing facilities elsewhere. He noted, thirdly, that because of their age and the limited usefulness of their skills outside their craft, the employees might not be able to find re-employment if they lost their jobs as a result of a strike. Finally, he warned those who did not believe that the plant could go out of business to "look around Holyoke and see a lot of them out of business." The president sent letters to the same effect to the employees in early November, emphasizing that the parent company had no reason to stay in Massachusetts if profits went down.

During the two or three weeks immediately prior to the election on December 9, the president sent the employees a pamphlet captioned: "Do you want another 13-week strike?" stating, inter alia, that: "We have no doubt that the Teamsters Union can again close the Wire Weaving Department and the entire plant by a strike. We have no hopes that the Teamsters Union Bosses will not call a strike.... The Teamsters Union is a strike happy outfit." Similar communications followed in late November, including one stressing the Teamsters' "hoodlum control." Two days before the election, the Company sent out another

pamphlet that was entitled: "Let's Look at the Record," and that purported to be an obituary of companies in the Holyoke-Springfield, Massachusetts, area that had allegedly gone out of business because of union demands, eliminating some 3,500 jobs; the first page carried a large cartoon showing the preparation of a grave for the Sinclair Company [employer] and other headstones containing the names of other plants allegedly victimized by the unions. Finally, on the day before the election, the president made another personal appeal to his employees to reject the Union. He repeated that the Company's financial condition was precarious; that a possible strike would jeopardize the continued operation of the plant; and that age and lack of education would make re-employment difficult. The Union lost the election 7–6, and then filed both objections to the election and unfair labor practice charges which were consolidated for hearing before the trial examiner.

While the case involved an order to negotiate based on union cards signed by a majority of the employees, the United States Supreme Court upheld a finding that the employer's conduct regarding a previous representation election went too far. Regarding the employer's right of free speech, the Court considered certain rules of the NLRB and then stated:

[B]ut we do note than an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board....

Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of the relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. Stating these obvious principles is but another way of recognizing that what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent, not the election of legislators or the enactment of legislation whereby that relationship is ultimately defined and where the independent voter may be freer to listen more objectively and employers as a class freer to talk....

[T]hus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

395 U.S. at 617–19, 89 S.Ct. at 1941–42, 23 L.Ed.2d at 580–81 (citations omitted).

II. *Substantial evidentiary support?* We pass then to the question of whether substantial evidence exists to sustain PERB's decisions under its rules 5.4(3)(b) and (g).

A. As to rule 5.4(3)(b), the organization contends, notwithstanding PERB's holding

of no misrepresentations, that the election must be invalidated because "misstatements of material fact [were made in paragraphs 1 and 2 of the notice] without sufficient time for the adversely affected party to adequately respond."

Rule 5.4(3)(b) is, as the organization asserts, a restatement of the NLRB's holding regarding misrepresentation in *Hollywood Ceramics Co.*, 140 NLRB 221 (1962). PERB has emphasized that elections should not be lightly set aside in light of the following from *Hollywood Ceramics:*

> "We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election. However, the mere fact that a message is inartistically or vaguely worded and subject to different interpretations will not suffice to establish such misrepresentation as would lead us to set the election aside. Such ambiguities, like extravagant promises, derogatory statements about the other party, and minor distortions of some facts, frequently occur in communication between persons. But even where a misrepresentation is shown to have been substantial, the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election."

*Lucas County Memorial Hospital,* PERB Nos. 627, 792, 793 (1977) (quoting *Hollywood Ceramics,* 140 NLRB at 224).

■ The organization claims that paragraphs 1 and 2 of the notice contain the following "substantial departure[s] from the truth" as set forth by the hearing officer, and had a significant impact on the election:

1). The notice gives the employees the mistaken impression that if they select the Organization as their bargaining representative, the employees would not be guaranteed a contract regardless of the fact that the Act provides for impasse procedures ending with arbitration and a binding collective bargaining agreement, 2). An employee, unsophisticated in labor relations matters, could reasonably conclude from reading the notice that the District could unilaterally reject without further negotiations any union proposal which the District considered to be detrimental to the District, 3). The District's statement "The only things required by law exist" would lead the employees to question the need for an exclusive bargaining representative if, in fact, negotiations only included mandatory subjects of bargaining, and 4). Although the Organization cannot guarantee job security, Section 9 of the Act requires the District to negotiate on several mandatory items affecting job security such as seniority, transfer procedures and staff reduction procedures. Additionally, the Organization contends that it did not have adequate time the day before the scheduled election to respond to the District's notice by either seeking legal advice or drafting a response.

The organization thus concludes that invalidation is required under *Hollywood Ceramics.* The hearing officer reached a different conclusion, with which the board agreed:

> It is my considered opinion however that the statements at issue do not contain any substantial misrepresentations of fact *or* law. Rather, the statements can best be described as being inartistically or vaguely worded. Clearly, the statements are subject to different interpretations. Although the District's definition of good faith bargaining does not technically meet the established legal definition I cannot conclude, as the Organization contends, that this statement or the other statements in the notice substantially distort the essential elements of the truth. Indeed, the notice clearly emphasizes the District's position

that the District will bargain over only mandatory subjects of bargaining. The notice does not state that the District will refuse to negotiate with the Organization. These statements constitute the District's bargaining position and as such do not violate Board Rule 5.4(3)b.

We think this interpretation of paragraphs 1 and 2 is plausible and we thus uphold the determination of the hearing officer and the board. We need not decide whether a contrary holding by them would have had substantial evidentiary support.

Although we have no occasion to consider the question because of the holding that the notice did not violate rule 5.4(3)(b), we note that the NLRB has recently returned to the test regarding misrepresentation set out in *Shopping Kart Food Market, Inc.*, 228 NLRB 1311 (1977). *Midland National Life Insurance Co.*, 263 NLRB No. 24 (1982). The Court of Appeals for the Eleventh Circuit approved that test in *Certainteed Corp. v. NLRB*, 714 F.2d 1042 (11th Cir.1983). Under the *Shopping Kart* rule, the NLRB will intervene in misrepresentation cases only (1) "where a party has used forged documents which render the voters unable to recognize propaganda for what it is," or (2) "when an official Board document has been altered in such a way as to indicate an endorsement by the Board of a party to the election." *Certainteed*, 714 F.2d at 1047.

B. As to PERB's holding that the district's notice contained "a veiled threat [in violation of rule 5.4(3)(g)] that [employees] would be laid off if they voted for the organization," rule 5.4(3)(g) proscribes conduct which "prevents employees from freely expressing their preferences in the election."

In analyzing what is and what is not permissible under rule 5.4(3)(g), federal case law interpreting similar federal statutes constitutes persuasive authority. *Sergeant Bluff-Luton Education Ass'n v. Sergeant Bluff-Luton Community School District*, 282 N.W.2d 144, 147 (Iowa 1979); *see City of Dubuque v. Telegraph-Herald, Inc.*, 297 N.W.2d 523, 526–27 (Iowa 1980).

Under the federal statute previously cited by us, Congress has limited freedom of speech in pre-election campaigns by section 8(c) of the National Labor Relations Act, 29 U.S.C. § 158(c) (1976), within Constitutional limits, because of the potential for overreaching by both employers and unions. Section 8(c) is an amendment to the National Labor Relations Act for the purpose of designing "restraints in a manner that would encourage free debate and more adequately protect the First Amendment rights of employers and unions." *Hecla Mining Co. v. NLRB*, 564 F.2d 309, 313 (9th Cir.1977) (citing *Linn v. Plant Guard Workers*, 383 U.S. 53, 62, 86 S.Ct. 657, 663, 15 L.Ed.2d 582, 589 (1966)). As we pointed out, section 20.10(4) of the Iowa Code is a restatement of section 8(c).

In *Hecla* the court stated that "[o]nly those restrictions are imposed [on free speech] which are essential to permit a free choice in voting; an employee's vote should be neither coerced nor based upon an uninformed choice." The court added, "Evaluation of pre-election conduct requires that a balance be struck that prevents coercion and maximizes information." *Hecla*, 564 F.2d at 313.

The line between permissible predictions and proscribed threats has been drawn as follows:

It appears clear than an employer may not make predictions which indicate that he will, of his own volition and for his own reasons, inflict adverse consequences upon his employees if the union is chosen. This would constitute a threat of retaliation. Also, an employer may not, in the absence of a factual basis therefor, predict adverse consequences arising from sources outside his volition and control. This would not be a retaliatory threat, but would be an improper restraint nevertheless. Thus, an employer may not impliedly threaten retaliatory consequences within his control, nor may he, in an excess of imagination and under the guise of prediction, fabricate hobgob-

lin consequences outside his control which have no basis in objective fact. *NLRB v. Lenkurt Electric Co.*, 438 F.2d 1102, 1106 (9th Cir.1971) (citation omitted).

■ The test in a given case is whether a sufficient showing is made to permit a conclusion that the allegedly offensive conduct and the surrounding circumstances cumulatively tended to interfere with the election. *NLRB v. Claxton Manufacturing Co.*, 613 F.2d 1364, 1371 (5th Cir.1980). Application of that test requires a finding of (1) proscribed conduct (2) which prevented the employees from "freely registering their choice of a bargaining representative." *Hecla*, 564 F.2d at 314.

As to the first part of that test, a review of illustrative cases helps to identify acts which constitute permissible conduct or proscribed conduct. We first consider decisions in which conduct was found to constitute threats and thus to interfere with the ability of employees to make a free choice.

Employer conduct was held proscribed in *Nebraska Bulk Transport, Inc. v. NLRB*, 608 F.2d 311 (8th Cir.1979). Conversations occurred between the president of the company and employees. In one of those conversations the president said, "I'm not going to negotiate with the Union," and in another he said, "If you guys want the Union in, that is your prerogative, but I know what I'm going to do, I am going to sell out and close the doors." *Id.* at 315. Subsequently the employer sent a letter to the employees which stated:

If a union contract is signed, I believe that increased costs and loss of flexibility will require changes in methods of operation in order to remain economically sound, and if those changes are not successful, the signing of a union contract could mean the closing of our operation.

In another case employer statements were held to go "beyond prediction or expression of opinion...." *NLRB v. Noll Motors, Inc.*, 433 F.2d 853 (8th Cir.1970). Initially the president of the company called attention to other plants that had closed after unionization. He reminded employees of prior unsuccessful attempts to unionize his company, stated that employees had gained nothing after going on strike, and asserted that "if the union succeeded this time" he would be forced to operate on a production basis and he did not know whether his employees could survive. Later he read a prepared speech. It stated in part:

No doubt, we have made some mistakes here at this Company but feel we have done our best. I simply do not see how bringing in some outsider is going to help us solve any of our problems—in fact it can be a trouble maker. As you know, the Union is just that—trouble in the past. You don't hear of strikes in nonunion plants, do you? I don't believe you want to invite the Union in here and put yourself in a position where someone in St. Louis can say, "hit the streets," do you? Some of you might say—well, even if the Union management in St. Louis did say, "hit the streets" I wouldn't do it. Maybe you wouldn't but the Union is always telling you that you ought to do this and so because everyone else is doing it—and I suppose that could include striking and walking the picket line whether or not you could meet your house, car or tax, and mortgage payments. This sort of going along with the crowd talk doesn't put money in your pay envelope. I'm sure none of us want the Adolph Hitler group thinking in this country.

. . .

Business and people are already leaving Moberly and Randolph County. We have less population now then we had here 20 years ago. The union over at the shoe factory alone, I am told, took over 600 jobs out of town—and I wish we had the service and sales of those people in town right now. I don't know what the situation will be with the MFA Packing plant at Macon as the Union won an election over there but MFA closed the plant. Whether it was because of the Union, I don't know. I certainly hope the people over here will not foul up the town so much with the Union. We could

use big business to help our young people in this area—and frankly to provide more work for us all. I am worried about the Bersted plant. While I want to make it perfectly clear that you have every right to vote union or not as you choose, I hope you will not bring in these potential friction makers into our group. I certainly do not feel guilty in the least in asking you to vote No—meaning no union. A year from now or later if you are not satisfied you can bring the union in—but once in the unions are not easy to get out.

The president also interrogated three employees, and a manager promised to help one employee purchase a used car and another to secure a requested work assignment, if the union was defeated. The court held the statements, considered as a whole, were sufficient to permit a finding of coercion.

A case from the Third Circuit involved three letters which were sent to employees. *NLRB v. Dowell Division of Dow Chemical Co.*, 420 F.2d 480 (5th Cir.1969). The first letter included a statement that the union "would not help the individual in terms of pay and benefits ... and it will definitely cost all employees something—perhaps a great deal." The second letter warned employees to "stick together" and vote against the union, or else employees are "going to be made to suffer because of the actions of a few who have been misled into supporting and working for the union." *Id.* at 481. Inevitably, the letter stated, jobs would be lost because of a strike and loss of customers. The third letter again referred to job security and, without explanation, stated that unionization would threaten it. The court held substantial evidence supported a finding of coercion because "the Company's suggestion of economic harm due to unionization had the natural tendency to imply retaliation for supporting the Union since they were not based on 'demonstrably probable consequences beyond [its] control.'" *Id.* at 482.

We now review illustrative cases involving lack of substantial evidence to support a conclusion that the employer interfered with free choice. An Eighth Circuit case dealt with the following allegedly objectionable remarks by a company vice president during a speech to employees:

As I said, there is no magic in unions. If a company is competitive, if it manufactures a good product in an efficient and productive way, there is going to be job security whether you have a union or whether you do not. I have dealt with a number of unions in which I have had to shut down plants, or move them elsewhere. I've sat at the bargaining table and told an international union that you'll either have to agree to the company's position or we'll shut the plant down. They didn't believe me and we shut the plant down. These are not threats, these are simply facts showing what I think all of you really understand. Whether you have a union or whether you do not have a union, a company must remain competitive and it must grow if it is going to succeed.

*NLRB v. Intertherm, Inc.*, 596 F.2d 267, 277–78 (8th Cir.1979). The court considered the remarks in the context of the entire speech and concluded they "did not contain any implication that the company would shut down its plants on its 'own initiative for reasons unrelated to economic necessities.'" The remarks were merely the vice president's view of the possible economic consequences of a union victory. *Id.* at 278.

A similar result was reached in *NLRB v. General Telephone Directory Co.*, 602 F.2d 912 (9th Cir.1979). There the phrases used by the employer—such as "wage increases would become a negotiable term," the company would begin bargaining with a "blank piece of paper," and unionization would bring about "horse trading"—were relied upon by the NLRB to infer retaliatory action if the union was successful in the election. The court held these statements "innocuous in light of the circumstances...." *Id.* at 916. The statements merely set forth possible consequences of union

representation, and were made in a context indicating no other evidence of anti-union sentiment by the employer. "The mere fact of a statement's vagueness or obtuseness, even if intentional, does not warrant a necessary inference of threat or retaliation." *Id.* at 917.

Similarly, evidence of allegedly proscribed conduct was found insubstantial in *Hecla Mining Co. v. NLRB*, 564 F.2d 309 (9th Cir.1977). The court held that "isolated, nonthreatening statements of opinion cannot be 'transformed or transmuted by the magic of semantic labels' into threats which had significant effects upon an election." *Id.* at 316. Some of the alleged threats were held permissible because based on fact. These included: the union was a "bad deal" because employees were paid better at Hecla than employees "at six other mines, worse than those at one mine and the same as those at another mine"; a free transfer policy between work sites might not be compatible with union structure because of the policies of various unions organized at the various work sites; and an employee might not be able to obtain a particular job because it could be under the jurisdiction of another union. *Id.* at 315. In addition, a low-level company official suggested to an employee that "the union would not help the workers because they already had everything they could hope for." *Id.* at 314. This statement was held to constitute a threat but it was also found not to have an impact on the election because it was made by a low-level supervisor, it was the only evidence of anti-union activity, and it constituted an isolated statement.

Another case of insubstantial evidence is *NLRB v. Lenkurt Electric Co.*, 438 F.2d 1102 (9th Cir.1971). There, statements by the employer were claimed to constitute implied threats that employees would be deprived of certain benefits and would be subjected to more rigid working conditions if the union won the election. The employer stated the possibility that "a more strict regimentation of working hours would be implemented" such that coffee breaks, lunch hours, and conversation while working would be regimented, as they were in unionized portions of the company; a more strict observance of working time would result from a switch from salary to an hourly wage, as happened when other employees unionized; working conditions may become "more difficult" because the company may have to reduce operating costs by using a paper which was more difficult to handle; sick leave and other fringe benefits might change as they did when others unionized; and employees with diversified experience might be at a disadvantage because unions were adverse to temporary transfers outside an employee's main department. *Id.* at 1106–07. These statements were held permissible, particularly against a background that included no anti-union animus on the part of the employer, no indication that the employer was adamantly opposed to this particular union, and a conscious effort by the company to avoid a campaign against the union until the final two weeks before the election. In addition, each statement had a basis in fact. *Id.* at 1108.

Similar results were reached in *NLRB v. Sonora Sundry Sales, Inc.*, 399 F.2d 930, 935 (9th Cir.1968) (employer can comment on disadvantages of union, including existence of union contract which calls for a lower wage rate than employees currently received; such a statement cannot rationally be converted into an implied threat); *Don The Beachcomber v. NLRB*, 390 F.2d 344, 345 (9th Cir.1968) (prediction that union policies could force employer to reduce available overtime which would limit tips waiters could receive, held to be nonthreatening); *NLRB v. Golub Corp.*, 388 F.2d 921, 924–29 (2nd Cir.1967) (employer expressed opinion that rules of a union contract or union administration of contract would forbid certain privileges, held that employer was not aiming to withdraw privileges in retaliation if union won election); *NLRB v. TRW-Semiconductors*, 385 F.2d 753, 759 (9th Cir.1967) (employer may express an opinion as to what union may require employer to do; statement that employees may not keep "all the fine things

[they] now have" and that company may "bargain from scratch" were mere predictions of possibilities or probabilities; and an employer prediction that union would cause adverse consequences through strikes was permissible because the employer was not stating that adverse action would be taken if the union won). *See also Southwire Co. v. NLRB*, 383 F.2d 235, 238–42 (5th Cir.1967).

■ Consideration of these decisions leads us to conclude in this case that substantial evidence does not exist in support of PERB's conclusion the notice posted by the superintendent constituted proscribed conduct. The notice contained no express or implied threat of job elimination. It merely set forth conditions, which neither the district nor the union could control, under which staff reductions become necessary. The district made no reference to adverse consequences that it would inflict on its own volition if the union won, nor did the district fabricate "hobgoblin" consequences outside its control having no basis in objective fact. The notice was no more than a statement, based on well-known fact, that the union could not guarantee the existence of jobs; it was not a threat.

■ Although the notice was not threatening, we nonetheless consider the question of whether it prevented the employees "from freely expressing their preferences in the election." This second part of the test under rule 5.4(3)(g) involves an evaluation of the impact of the notice. In considering impact, "factors to be considered include the rank of the individual who engaged in the conduct, whether the employer or the employee initiated the communication, the total background of all preelection conduct and of course any evidence directly suggesting that the conduct had either an isolated or pervasive impact." *Hecla*, 564 F.2d at 314. Other factors include "the number of threats, the severity of the threats and whether those threatened were put in fear, the number of workers threatened, whether the threats were made close to the election and whether they persisted in the minds of the employ-

ees at the time of the election, whether the reports of threats were widely circulated, whether the effect of pro-union threats were cancelled out by pro-management threats, the closeness of the vote ... and whether the threats can be attributed to the union or management." *Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000, 1005 (3rd Cir.1981). Also to be weighed is the impact of an employer's economic control over an employee.

■ Although we subscribe to the objective test of evaluating the notice and its effect, *NLRB v. Gulf States Canners, Inc.*, 585 F.2d 757, 759 (5th Cir.1981), we note that the testimony made clear the notice was not perceived by members of the organization as an implied threat. In regard to her perception of the notice on the day it was posted, the president of the organization testified: "I didn't think it meant anything that day." She also testified she received four or five calls from organization members who asked if the notice meant the district would eliminate jobs if the union won. Her answer was "No." She did not call a meeting to explain the notice. A former secretary of the organization stated that the notice merely indicated to her the district did not want the union. She did not discuss the notice with other members of the organization, nor did she discuss it with the organization's president.

Both the president and former secretary testified the district made no threats of reprisal or of force, nor did it make promises of benefit.

No testimony was introduced that the school superintendent ever dealt with the organization in bad faith. Nor was evidence of any objective fact introduced indicating an adverse effect on the employees' freedom to choose.

The notice was nothing more than an isolated, nonthreatening statement of the district's opinion as to what the union would be able to provide in the way of job security. Such a statement cannot be "transformed or transmuted by the magic

of semantic labels" into a threat which had a significant impact on the election. *General Telephone Directory Co.*, 602 F.2d at 918. "The mere fact of a businessman's awareness, and statements to that effect to his employees, of the possible consequences of union representation, does not support ... in the absence of evidence of other anti-union activity, the inference herein made by the Board of threatening or coercive behavior." *Id.* at 917. "Interference with employees' exercise of free choice must be present in the record to such an extent that an inference can be drawn that the conduct materially affected the election results." *Worley Mills, Inc. v. NLRB*, 685 F.2d 362, 368 (10th Cir.1982); *see NLRB v. Gulf States Canners*, 634 F.2d 215 (5th Cir.1981), *cert. denied*, 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981). Here, the record does not support an inference that the notice was such as would have affected the ability of the employees to make a free choice, contrary to rule 5.4(3)(g).

Because we find that the notice in question did not violate rules 660–5.4(3)(b) and (g) of the Iowa Administrative Code, we have no occasion to decide whether section 20.10(4) of the Iowa Code has a limiting effect on those rules.

The district court reached the right result.

AFFIRMED.